FOX et al. v. UNITED STATES et al.

THE LOVELAND 50.

THE CLATSOP.

THE VISITOR COMPANY.

UNITED STATES v. THE LOVELAND 50 et al.

UNITED STATES v. THE VISITOR et al.

Nos. 171, 295, and 305 of 1945.

District Court, E. D. Pennsylvania.

Oct. 8, 1947.

Rawle & Henderson, of Philadelphia, Pa., for Fox and Loveland, respondents.

Howard M. Long, of Philadelphia, Pa., for Lewis F. Boyer, Jr., et al., petitioners and owners and claimants of the Visitor.

Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., Russell L. Hiller, Asst. U. S. Atty., of Reading, Pa., and John T. Casey, Sp. Asst. Atty. Gen. (J. Frank Staley of Washington, D. C., of counsel), for the United States.

KIRKPATRICK, District Judge.

This suit in admiralty arises out of a collision between the dredge Clatsop and the barge Loveland 50 which, at the time, was in tow of the tug Visitor.

At about 2:30 A. M., December 4, 1944, the Clatsop was coming down the Schuylkill River near its mouth intending to turn to the right into the Delaware River and proceed down the Delaware. At the same time the tug Visitor, with the barge made fast on its port side, was in the Delaware below the mouth of the Schuylkill moving upstream intending to turn left into the Schuylkill and proceed up that river. It was a clear night with a flood tide and there were no other vessels in the neighborhood. The Clatsop was making about six and one-half knots over the ground and the tug about four and one-half knots.

Wills, the mate in charge of the Clatsop, first saw the lights of the tug and barge at a distance of about one and one-quarter miles, measured on a straight line across shoal water but somewhat farther measured along the course which the vessels would have to follow in order to pass. At that time the Clatsop was a little to the right of the center of the Schuylkill channel and about a mile from the point where the Schuylkill channel meets the Delaware channel, and the Visitor was in the Delaware channel, about the one-half mile below that point and to the left of the ranges.

Not knowing whether the tug intended to turn into the Schuylkill or to continue on past, up the Delaware, Wills did not signal at once for a passing but kept on his course until the vessels were about one-quarter mile apart when he blew a one-blast signal and, either just before or just after that,

put his rudder hard right and hauled to starboard for a port to port passing. He was too far out in the Delaware *—undoubtedly farther out than he thought he was—to make the maneuver safely and his turn to starboard brought his vessel directly in the path of the tug and barge. A last minute effort to avoid the collision on the part of both vessels resulted in setting them head to head, and the port bow corner of the barge came in contact with the port side of the Clatsop a few feet from her bow.

The Visitor had kept a practically straight course up to the moment of the collision, except that her efforts in extremis to avoid it may have caused her to swerve just before the impact.

Watson, the mate in charge of the Visitor, had seen the Clatsop's lights as she was "coming out into the Delaware" and blew a one-blast signal. He had not heard the Clatsop's signal and whether his blast came before it or after it (as testified to by Wills) is not of great moment because the fact is that, just about the time when the Clatsop began its haul to starboard, both vessels had signaled for a port to port passing and were in accord, if not in conscious agreement, in making the maneuver. The important point is that the Visitor realized almost immediately that the Clatsop was too far out in the Delaware to accomplish the passing safely and promptly did the best thing possible under the circumstances, namely, blew danger signals, blew for a starboard passing in an attempt to warn the Clatsop to turn to port, repeated the series twice and then went full speed astern. On the other hand, the navigator of the Clatsop evidently did not, until the very last minute, realize that the port to port passing was

likely to result in a collision but kept right on, not heeding, and possibly not hearing, the Visitor's call for a starboard passing and danger signals until too late, when he reversed his engines. His version, to the effect that the maneuver could have been safely made and that a sudden turn to port on the part of the Visitor was what caused the collision cannot be accepted. The points of impact upon the two vessels as shown by the photographs makes it demonstrably impossible that the Visitor could have been swinging to port at the time and it is hardly conceivable that the unwieldly tow could have made the sort of S curve which would have been necessary if she had made any such swing earlier.

The Government's argument that the collision was due to the fault of the Visitor is based on its contentions (1) that because Watson held no pilot's license he was therefore an incompetent navigator, (2) that the Visitor was improperly manned in having no lookout other than Watson who was acting as navigator, lookout and wheelsman, and (3) that the Visitor, as she proceeded up river, was to the left of the center of the channel. I cannot see that any of these things, even if true, had anything to do with the accident. So far as the Visitor is concerned, the sole question is whether she was properly navigated and I think she was. Whatever her position with respect to the center of the channel, there is no suggestion in the testimony that a port to port passing could not have been safely made had the Clatsop started the maneuver before she got as far out in the Delaware as she did, nor that when it became evident that the maneuver was dangerous a starboard passing could not have been safely made had

---

* The placing of the vessels at various times as "in the Delaware" or "in the Schuylkill" by the witnesses leads to some uncertainty for the reason that, after passing between the two points of land which mark the mouth of the Schuylkill, the vessel will still be in a dredged channel which is an extension of the Schuylkill River channel for nearly one-half mile before reaching the channel of the Delaware River. Watson's testimony, which I accept upon the point, is to the effect that after the Visitor's one-blast signal the Clatsop kept on across his bow and did not begin to swing

to its right until it had reached a point about 45 degrees off the starboard bow of the Visitor. In view of the fact that the Visitor was running parallel to the Delaware River ranges, this places the Clatsop, at the time she began her attempted port to port passing, somewhere near the middle of the Delaware River channel. This is supported by the testimony of Parsons, the Clatsop's quartermaster, who testified that his vessel began to turn when he had got out so far that he was almost on the Fort Mifflin ranges.

she accepted, before it was too late, the Visitor's call for such passing.

All statements of fact made in the foregoing opinion and notes may be taken as special findings of fact.

In view of the conclusion reached it is unnecessary to dispose of the petition for limitation of liability filed by the owners of the tug Visitor.

### Finding and Conclusion

I find as a fact that the collision was due to the sole fault of the dredge Clatsop.

I conclude that the libellants are entitled to recover their damages against the United States and that the petitioners as owners and claimants of the tug Visitor are entitled to have the libel against them dismissed.

A decree may be entered accordingly.